UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIKIKO KITANI,

PLAINTIFF,

-against-

CITY OF NEW YORK; NEW YORK CITY TRANSIT
AUTHORITY; OFFICE of ADMINISTRATIVE
TRIALS and HEARINGS; LOCAL 375; ANDY
BYFORD; ANTHONY CASSELLA; CRAIG COSTA;
and PIERRE SYLDOR (in their individual and official
capacities),

DEFENDANTS.

## SUMMONS & COMPLAINT
## JURY TRIAL REQUESTED

*Duly Submitted by:*          Special Hagan, Esq.
                             **LAW OFFICES OF SPECIAL HAGAN, ESQ.**
                             196-04 Hollis Avenue
                             Saint Albans, New York 11412
                             (917) 337-2439 (Telephone)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.......................................................................................X
MIKIKO KITANI,
                                            PLAINTIFF,


            -against-


CITY OF NEW YORK; NEW YORK CITY TRANSIT          **SUMMONS &**
AUTHORITY; OFFICE of ADMINISTRATIVE TRIALS and   **COMPLAINT**
HEARINGS; LOCAL 375; ANDY BYFORD: ANTHONY
CASSELLA; CRAIG COSTA; and PIERRE SYLDOR (in their   **Civil Docket No.**
individual
and official capacities)                          **JURY TRIAL**
                                                  **REQUESTED**


                                            DEFENDANTS.
.......................................................................................X



        PLAINTIFF, MIKIKO KITANI ("KITANI" or "PLAINTIFF"), by and through her attorney,

SPECIAL HAGAN, ESQ., complains of Defendants: THE CITY OF NEW YORK (CITY); NEW YORK

CITY TRANSIT AUTHORITY (NYCTA); OFFICE of ADMINISTRATIVE TRIALS and HEARINGS

(OATH) LOCAL 375; ANDY BYFORD; ANTHONY CASSELLA; CRAIG COSTA; and PIERRE

SYLDOR , in their official and individual capacities alleges as follows:



## I.INTRODUCTORY STATEMENT

1.  This is an action for injunctive relief, declaratory judgment, equitable relief, monetary damages,

and punitive damages, to remedy violations of the rights of MIKIKO KITANI under the 14th

Amendment of the United States Constitution's Equal Protection Clause; 42 U.S.C. § 1985; 42

U.S.C. § 1983; the Family Medical Leave Act (FMLA 29 U.S.C.A. §§ 2601 et. seq.); the Equal Pay

Act (EPA); 29 U.S.C. § 206 et. al.,; Labor  Management Relations Act (LMRA), 29 U.S.C. § 185 ("Section 301") and CPLR §§ 7801 et. al.

2. Plaintiff seeks damages based on the disparate treatment she continues to experience based on her gender under the Equal Pay Act and the Equal Protection Clause. Plaintiff seeks damages based on Defendants willful interference of medical leave and retaliation  in violation of the FMLA.  Plaintiff also seeks damages for their failure to pay wages and their failure of their duty of representation pursuant to the LMRA. Lastly, Plaintiff relief under CPLR 7801 due to Defendants' improprieties during the disciplinary process and the unwarranted charges and specifications that were filed against her in general.

## I.  THE PARTIES

3.    PLAINTIFF, MIKIKO KITANI (KITANI) is a woman who suffers from debilitating migraine headaches.

4.    KITANI is a resident of the State and City of New York.

5.    KITANI has been continuously employed by the New York City Transit Authority (NYCTA) from 2013 to present.

6.    KITANI's current civil service title is Civil Engineer Level I.

7.     At all times relevant, Plaintiff was eligible for leave under the Family Medical Leave Act (FMLA).

8.     At all times relevant, Plaintiff was an employee as defined by the FMLA and the Equal Pay Act (EPA).

9.     Defendant, CITY was and is a municipal corporation and existing under and by virtue of the laws of the State of New York; at all times relevant CITY/New York City Transit Authority (NYCTA) is Plaintiff's employer.

10.    At all times relevant herein, KITANI was an employee of NYCTA

3

11.  The NEW YORK CITY TRANSIT AUTHORITY (NYCTA) is a public benefit corporation, non-mayoral City agency, that exists pursuant to the New York State Public Authorities Law, § 1201 et. seq.

12.  NYCTA is a public corporation that manages and operates all city owned bus, trolley and subway routes.

13.  Defendants at all relevant times has been an employer as defined by the FMLA and EPA.

14.  Defendant is an employer, who at all relevant times has employed over 50,000 employees at over 20 major departments.

15.  Pursuant to § 1048 of the City Charter,  the Office of Administrative Trial and Hearings  (OATH) is a tribunal designated to conduct adjudicatory hearings for all agencies of the City of New York.

16.  Local 375, Civil Service Technical Guild  (LOCAL 375), is a labor organization with a place of business at 125 Barclay Street, New York, New York 10007.

17.  For all times relevant, Plaintiff was a member of LOCAL 375 while employed at NYCTA.

18.  At all times relevant and upon information and belief, Defendant ANTHONY CASSELLA (CASSELLA), is a resident of the State of New York.

19.  At all times relevant, CASSELLA was employed by NYCTA, as Assistant Chief Officer of Infrastructure Engineering over the Maintenance of Way Division (MOW), Department of Subways.

20.  At all times relevant, CASSELLA was Plaintiff's supervisor during her employment at NYCTA.

21.  CASSELLA  has substantial policy making authority as defined by the New York City Charter; and has the ability to make personnel decisions.  In his capacity, CASSELLA was also the final decision-maker when it came to disciplinary matters in the unit; all managers who sought to discipline staff had to obtain CASSELLA's approval.

22.  At all times relevant, CASSELLA acted directly and personally as it pertains to the allegations

herein.  CASSELLA is sued here both in his individual and official capacities.

23.    At all times relevant and upon information and belief, Defendant CRAIG COSTA (COSTA), is a
resident of the State of New York.

24.    At all times relevant, COSTA was employed by NYCTA as Director of Labor Relations.

25.    At all times relevant, COSTA had substantial policy making authority as defined by the New York
City Charter.  COSTA has the ability to make decisions they pertain to disciplinary proceedings and
complaints for the NYCTA.

26.    At all times relevant, COSTA acted directly and personally as it pertains to the allegations herein.
COSTA is sued here both in his individual and official capacities.

27.    At all times relevant and upon information and belief, Defendant Pierre Syldor (SYLDOR) was
employed by NYCTA, as Senior Director of MOW Engineering.

28.    At all times relevant, SYLDOR has been Plaintiff's direct supervisor.  At all times relevant,
SYLDOR acted directly and personally as it pertains to the allegations herein.  SYLDOR is sued here
both in his individual and official capacities.

29.    At all times relevant, Defendants acted in concert under color of the statutes, ordinances,
regulations, customs and usages of the Constitution of the United States; Defendant also acted under
the authority of their respective positions or offices.

### III.    JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343 to secure
protection of and redress the deprivation of rights secured by: the 14th Amendment of the United
States Constitution; 28 U.S.C. §§ 1985 and 1983;  29 U.S.C. § 206 et. seq; 29 U.S.C.A. §§ 2601 et.
seq.; and 29 U.S.C. § 185 et. seq.

31. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Plaintiff's state law claims arising under CPLR 7801, because the Plaintiff's federal and state clams derive from a common nucleus of operative facts and form part of the same case or controversy.

32. Venue is proper under 28 U.S.C. § 1391 in that Defendants either maintain offices or facilities in this district.

33. Plaintiff's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201, and 2202.

## IV. FACTS

34. KITANI has a Bachelor's of Science in Civil Engineering from the University of Vermont and a Master's in Business in Administration from Baruch College's Zicklin School of Business.

35. KITANI almost 20 years of experience as an Engineer.

36. KITANI has the following licensures and certifications: she is a licensed engineer; and she has (Leadership in Energy and Environmental Design in Building Design and Construction (LEED, BD +C).

37. KITANI had a listed salary of $80,305 for purposes of this complaint, but due to the Defendants' discriminatory and retaliatory actions she only made $34,532.

38. KITANI is therefore qualified for the position and permanent civil service title she holds: Civil Engineer Level 1.

39. KITANI has been employed by the City of New York in 2010.

40. KITANI began working at NYCTA on September 3, 2013.

41. KITANI began working in NYCTA MOW division in May 2014.

42. At all times relevant KITANI reported directly to Pierre Syldor (SYLDOR).

43. At all times relevant, KITANI also reported directly to Anthony Cassella (CASSELLA).

44.    KITANI continued to work in her permanent civil service title of Civil Engineer Level I when she

began working at MOW.

**Equal Pay Act & Gender Discrimination**

45.    As a Civil Engineer Level I in MOW, KITANI should have performed the following tasks:

provide field inspections, technical support and structural designs for various NYCT stations, tunnels

and facilities.  She should have also been tasked with traveling to various NYCT construction sites

during regular work hours or for emergency response situations on an on-call basis.

46.    Initially, when KITANI went to MOW she performed some field work, however as time

progressed it became clear that she was being treated differently than her male counterparts.

47.    KTANI directly reports to SYLDOR, who is the Senior Director of her unit.

48.    At one time or another during the relevant period, there were at least five other employees in

KITANI's unit:   Gregory Neis (NEIS); Hancock Petit-Frere (PETIT-FRERE; Mohammad Al-Hasan

(HASAN); Avinash Persaud (PERSAUD); and Ehab Attah (ATTAH).

49.    At all times relevant KITANI was the only woman that SYLDOR managed.

50.    At all times relevant KITANI was the amongst the lowest paid employees in the unit.

At all times relevant KITANI performed the same functions of doing sight inspections as the other men in

the unit; despite the fact that they had different civil service titles.

51.     Again NEIS performed the same job functions as KITANI until his promotion, and was paid more.

52.     In or around November 2016, the Department of Citywide Administrative Services (DCAS) offered two examinations for Administrative Engineers:  Exam 7516 and Exam 7012.

53.     NEIS took Exam 7516 where he was included in a published list of 787 passing examinees throughout the city in or around May 2017.

54.     NEIS was 739 out of 787 on the list.

55.     NEIS was promoted in October 2017 despite the fact that he had only 2 years of experience with Transit.

56.     In comparison, when KITANI took Administrative Engineer Exam 7012 in November 2016.

57.     KITANI was ranked 178 out of 662 passing examinees.

58.     Despite the fact that KITANI was ranked much higher than NEIS and that she had much more experience in City government and as a professional engineer in general, she was not promoted.

59.     Instead CASSELLA, COSTA, and SYLDOR manufactured disciplinary charges to avoid promoting KITANI in the same fashion as they had NEIS.

60.     CASSELLA, COSTA and SYLDOR worked in concert to ensure that KITANI was not promoted by suspending her indefinitely for over 15 months.

61.     Typically, upon the receipt of disciplinary charges an employee is either suspended at maximum 40 work days or terminated.

62.     However, in further retaliation and gender-based animus, CASSELLA, COSTA and SYLDOR insured that KITANI went unpaid or underpaid for over 15 months.

63.     CASSELLA, COSTA and SYLDOR worked together to ensure that KITANI would not be promoted in the same fashion as NEIS.

64. Upon information and belief, no other males managed by CASSELLA and or SYLDOR have been suspended over 40 days without pay pending disciplinary charges.

65. To this day, KITANI has yet to be promoted despite the fact that she scored higher than NEIS.

66. In fact, KITANI is the only person in the unit who passed the Administrative Engineering Exam and was not promoted within her unit.

67. KITANI is the only woman in her unit and her male comparators were all promoted either in title or salary after they passed either Exam 7012 or 7516.

68. KITANI was also paid less than Al-HASSAN

69. Also unlike the men in the unit, KITANI was denied opportunities to work in the field, she was also denied the opportunity to earn over time.  However, the men in the unit were all regularly assigned to do field work and were all regularly assigned over time.

70. As such, although KITANI's base salary may have been the same as some of the men in the unit, her take home earnings were much less because she was denied opportunities to do field work and over time.

71. Accordingly, KITANI's opportunities for professional advancement with MOW were also being curtailed unlike the men in the unit.

72. KITANI was also treated differently than the men in her unit in terms of: leave requests and the flexibility in the times they could report to work .

73. For example, Mohammad al-Hasan (AL-HASAN) was allowed to take a month of continuous leave without undergoing as extensive of a documentation process as KITANI would have to down the line.

74. AL-HASAN was also allowed to report to work at 10:30AM and to remain on NYCTA premises without rebuke from either CASSELLA or SYLDOR.

75.    AL-HASAN is a male and also makes more than KITANI, despite the fact that he does not have the same licensures and despite the fact that he performs the same job functions.

76.    In or around January 2016, HENOCK, a male under both the supervision of SYLDOR and CASSELLA, announced to the unit that his health would not allow him to perform his normal job functions.

77.    Unlike KITANI, HENOCK obtained the support of Henry Cho (CHO) and other staff members to support him in the performance of his job duties; the men in the unit supported HENOCK while they did not support KITANI.

78.    Unlike the other men in the unit KITANI also was denied a transit issued cellphone.

79.    Having a transit issued cellphone was integral to KITANI and the rest of the unit's job functions because they were on call 24/7.

80.    Therefore, unlike the other men in her unit KITANI was not able to respond to emails or calls instantaneously.  As such in or around September 2016, when she sought bereavement for her uncle's funeral KITANI was disciplined for not responding in a "timely" manner.

81.    Despite not having portable remote access and a 3-hour time difference, KITANI responded within 8 hours of the initial email from SYLDOR.

82.    Unlike the men in her unit, KITANI was also denied access to the latest computers and computer operating systems (i.e. software).  As such, it took her longer to perform tasks than the men in her unit since both the operating system and her hardware were antiquated, while the men in the unit had the most current laptops and operating systems.

**Retaliation for Complaints of Discrimination**

83.    KITANI initially verbally conveyed to CASSELLA that she had been denied opportunities to do field work and make overtime. She also shared with CASSELLA that one of the managers specifically said that she did not do field work.

84.    KITANI expressed to CASSELLA that the manager's statement was indicative of gender bias. She also expressed concern that her opportunities for professional advancement and earnings were being unfairly hampered by the unit's manager.

85.    KITANI then shared with CASSELLA that she could perform overtime and field work as long as she was not assigned to work more than two consecutive shifts within a 24-hour period.

86.    KITANI required this restriction because the long hours would cause her to have debilitating migraine headaches. A condition that was known to CASSELLA and MOW management at the time.

87.    KITANI's request for no more than 2 consecutive shifts was based on her medical condition.

88.    Coincidentally, KITANI's request was also consistent with the collective bargaining agreement, which prohibited the assignment of workers to more than 2 consecutive shifts within a 24-hour period.

89.    However, MOW regularly violated this section of the CBA and regularly assigned staff to multiple consecutive shifts.

90.    Upon information and belief, MOW's violation of this restriction was so frequent that they consistently exceeded the agency's overtime cap, with staff earning over 30% if not more of their salaries in overtime.

91.    As such, due to the repeated denial of over time and field work opportunities, which KITANI had from time to time, she nevertheless earned anywhere from 20K to 50K less than her comparators.

92.    In or around January 7th, 2016, CASSELLA asked KITANI to draft a G-2 aka "Statement of Facts" (a memorandum on NYCTA letterhead), that described her restrictions and the conditions

upon which she could work.

93.    KITANI complied with this request and provided CASSELLA with a G-2/Statement of Facts that described her conditions under which she could work; she provided examples of work assignments that would allow her to earn over time and do field work on the same scale as the male comparators in her unit.

94.    CASSELLA became infuriated upon receipt of KITANI's January 15, 2016 "Statement of Facts."

95.    KITANI described MOW as a gender based hostile work environment where she had been assaulted and yelled at by a male staff person.

96.    The January 15, 2016 Statement of Facts described how KITANI reported the discrimination and assault that she experienced to SYDLOR and how he failed to address either issue.  The G-2 she provided to CASSELLA at that time described MOW as a gender based hostile work environment where, SYLDOR her direct supervisor failed to act.

97.    Upon receipt of the January 15, 2016 G-2, instead of investigating KITANI's complaint, CASSELLA demanded that she write another Statement of Facts

98.    CASSELLA's discriminatory animus and refusal to acknowledge KITANI's complaint of discrimination was further buttressed by Chief Officer Ken Mooney (MOONEY),  who said that he had never experienced an EEO complaint and that he did not know what do with KITANI's complaint.

99.    Upon information and belief, MOONEY also became infuriated by KITANI's complaint and also insisted that she change the content of her G-2 to just list the restrictions on the hours she could work.

100.    In order to further evade KITANI's complaint of discrimination at that juncture, CASSELLA would eventually lie and say he never received the January 15, 2016 G-2.

101.    KITANI eventually wrote another Statement of Facts on February 3, 2016, which she believed

was consistent with CASSELLA's bullying directive to write another one.

102.  Despite her efforts to comply however, KITANI experienced retaliation.

103.  KITANI went from occasionally being assigned field work and over time, to not being assigned any overtime between the months of February 2016 and October 2016.

104.  CASSELLA and SYLDOR would also assign KITANI to do out of title work that would place her professional engineering certification in jeopardy.  Specifically, they would insist that she use her stamp to certify work that was not permitted under her licensure requirements.

105.  KITANI also raised the issue that the work CASSELLA and SYLDOR attempted to have her perform work consistent with that of the Civil Engineer Level 3 she had replaced, who was a male and who made more money than she did.

106.  KITANI also noted that this male Civil Engineer Level 3 that she had replaced had the same qualifications and experience that she had, that she made over 30K less, and that she had a lower civil service title than he did.

107.  When it became apparent that CASSELLA and SYLDOR would not address her complaint, KITANI filed a grievance with Local 375 via Janek Patel (PATEL) in or around April/May 2016.

108.  Craig Costa (COSTA), the Director of Labor Relations became further involved with KITANI's problems in the unit.

109.  COSTA allegedly engaged in an investigation and determined along with CASSELLA and SYLDOR that KITANI was being asked to perform job functions consistent with her civil service title.

110.  Also immediately after the January through February 2016 EEO complaints, SYLDOR stopped speaking to KITANI.

111.  If SYLDOR wanted KITANI to do anything immediately after her EEO complaint, he would

email her.

112. SYLDOR did not treat the other staff members that he managed that had not filed complaints of discrimination this way.

113. SYLDOR also did not treat the men under his supervision in this fashion.

114. From February to October 2016, SYLDOR and CASSELLA also excluded KITANI from weekly meetings and training sessions which would provide her with the background and training necessary to perform field inspections and to obtain over time assignments.

115. KITANI's exclusion from weekly meetings and updates also blocked her from job opportunities.

116. CASSELLA and SYLDOR were aware of KITANI's condition since they had participated previously in the approval of her intermittent FMLA requests in 2014 and 2015.

117. KITANI also filed a grievance regarding the disparity in pay in April 2016.

118. After her complaints in March and May of discrimination, in June and July 2016, CASSELLA, SYDLOR, COSTA and NYCTA management worked in concert to deny KITANI's request for continuous FMLA.

119. In September 2016, CASSELLA refused to sign off the renewal of KITANI's professional engineering (PE) license certification.

120. It was standard practice at NYCTA and with CASSELLA that when Professional Engineers' licenses came up for renewal, that their supervising managers would sign off.

121. Upon information and belief, CASSELLA signed off on the male PEs' license renewals under his supervision.

122. CASSELLA attempted to justify his discriminatory and retaliatory animus by saying that KITANI was under investigation.

123. According to CASSELLA and COSTA, COSTA had begun to investigate KITANI in August

2016.

124.   To date, however, there have been no written findings or any other evidence that KITANI was being investigated.

125.   In October 2016, CASSELLA, COSTA and SYLDOR refused to approve KITANI's bereavement time.

126.   Unlike the men in the unit KITANI was made to provide extensive documentation to support her request.

127.   KITANI thought she had complied with the directives of COSTA, CASSELLA and SYLDOR, when she wrote a memo, had her uncle's death certificate professional translated from Japanese and provided them with an itinerary that depicted her travel itinerary for the period of bereavement time she requested.

128.   Nevertheless, despite these efforts, COSTA, CASSELLA and SYLDOR denied her the requested leave.  KITANI instead was marked AWOL and didn't receive pay for what would have been otherwise approved time for any man in the unit.

129.   Upon information and belief, COSTA, CASSELLA and SYLDOR never required any men in MOW to provide as much documentation in support of their requests for bereavement leave.

130.   In an act of further harassment, in or around October 13, 2016, KITANI would learn that COSTA and CASSELLA had directed Transit staff to go to her treating physicians' offices to demand paperwork regarding her medical records and treatment.

131.   Upon information and belief, clearly COSTA and CASSELLA had not engaged in this type of conduct with anyone else in the unit.  Especially since it was against the law.  However it would not be the last time that they would engage in such tactics to harass KITANI.

132.   Further evidence that COSTA and CASSELLA knew about the illegality of their conduct was

evidenced by the fact that they never produced any verbal or written notification that KITANI was allegedly under investigation.

133.    At no time did COSTA or CASSELLA either notify KITANI of this investigation either in writing or verbally until she later received disciplinary charges in January 2017.

134.    KITANI received disciplinary charges within an hour of complaining to NYCTA's EEO Office.

135.    Upon KITANI's email to EEO, within minutes, COSTA, CASSELLA, SYLDOR and NYCTA's HR staff insisted that KITANI immediately meet with them and her union representative in one of MOW's conference rooms.

136.    During the course of the meeting COSTA yelled at KITANI and threatened her.  Once he completed his tirade regarding KITANI going to the Medical Assessment Center (MAC) for involuntary medical assessment for fitness to work , COSTA then threw the disciplinary charges at KITANI, demanded that KITANI turn over her transit pass and demanded that she gather her things and leave.

137.    KITANI was never given an opportunity to comply with COSTA's demand to go to the MAC on January 9, 2017.

138.    Since her transit pass had been revoked she would not have been able to access the MAC facilities.

139.    KITANI reasonably believed that she had been terminated by COSTA, SYLDOR and CASSELLA on or about January 9, 2017.

140.    Upon information and belief, no other Transit staff person had been treated in this fashion by COSTA, SYLDOR and or CASSELLA.

141.    KITANI therefore left NYCTA premises under the belief that she had been terminated.  She had been humiliated in front of her colleagues as she was escorted out by security immediately with all of

16

the belongings she could carry in bags.

## Violations of FMLA

142.    KITANI experiences debilitating migraines.

143.    KITANI was initially diagnosed with this condition in the 90s.

144.    As time progressed her condition worsened.  As such, when she went to MOW in 2014 she

applied for intermittent FMLA.

145.    KITANI engaged CASSELLA and NYCTA's Business Services Center (BSC) along with a

number of staff in Timekeeping to obtain FMLA.

146.    At that time, KITANI qualified for FMLA.

147.    She was a full time Transit employee who had worked over 1,250 hours.

148.    Therefore, CASSELLA was fully aware of KITANI's FMLA usage and need for FMLA and

approved her initial request for FMLA.

149.    In practice, Transit adhered to a calendar year system of FMLA usage.

150.    KITANI was initially approved for FMLA in September 2014.

151.    According to Transit's practice, KITANI would receive an annual reminder to re-apply for FMLA

in August 2015.

152.    KITANI complied and again CASSELLA approved her request in August 2015.

153.    However, after KITANI complained of discrimination in January, March, April and May 2016,

CASSELLA along with NYCTA management disapproved KITANI's request for continuous FMLA

leave in June 2016.

154.    KITANI needed the additional leave because she had begun to experience an even more hostile

work environment under SYLDOR and CASSELLA.

155.    Accordingly, KITANI's migraine condition worsened and she began to miss more and more days

from work.

156.    Under the advisement of her doctors, both her neurologists and other treating physicians, KITANI was advised to take continuous leave from work to recover.

157.    KITANI applied for FMLA in June 2016 and was rejected on the false premise that she had not worked enough hours to qualify for leave under the FMLA.

158.    KITANI insisted that timekeeping provide her with the records for their determination.

159.    However, it became clear after repeated requests that Transit did not have adequate records to support their claims.  In fact, Timekeeping asked KITANI to provide them with her records and tabulations.

160.    Transit's failure to maintain adequate time records was in clear violation and interference with KITANI's right to obtain FMLA.

161.    Due to Transit's lack of timekeeping records, they erroneously stated that KITANI worked approximately 1,100 hours when in fact she had worked over 1,500, in excess of the 1,250 required under the FMLA.

162.    As a result of Transit's failure to maintain adequate timekeeping records, KITANI would have to come into work despite being told that she needed to be out on leave for treatment.

163.    Instead of being able to undergo treatment like the men in her unit; instead of the support that the men received; KITANI would have to fight for over 6 weeks during her prescribed leave time, to ensure that she obtained continuous leave under the FMLA.

164.    Unbeknownst to KITANI, in or about August 2016, only two months after she was approved for continuous FMLA and when it became indisputable that she met the requirements for leave, COSTA, CASSELLA and SYLDOR retaliated against her and began a witch hunt into her whereabouts while she was out on leave.

18

165.    This witch hunt would culminate in an indeterminable suspension where KITANI would not be paid for over 15 months.

166.    In retaliation, COSTA, CASSELLA and SYLDOR would insist that KITANI provide them with unprecedented levels of documentation…. Which were arbitrarily deemed insufficient and which ultimately led to KITANI being marked AWOL and without pay.

167.    COSTA, CASSELLA, SYLDOR and Transit management would arbitrarily change from their usual calculation of FMLA which for KITANI went from September 2016 to September 2017 at that time.

168.    By changing the FMLA calendar year arbitrarily, COSTA, CASSELLA, SYLDOR and Transit management would be able to manufacture grounds to discipline KITANI.

169.    COSTA and CASSELLA would arbitrarily determine that KITANI had exhausted her FMLA leave balances in November 2016, when in fact KITANI had enough leave balances to take her into 2017.

170.    COSTA, CASSELLA and SYLDOR would hold meetings with KITANI where they yelled and threatened her about her FMLA usage.

171.    COSTA, CASSELLA and SYLDOR would change the protocol for the approval of KITANI's timesheets:  while the other members of her unit that were supervised by SYLDOR would have their timesheets signed off by him, KITANI was required to have her timesheets signed off directly by CASSELLA.

172.    After several attempts again at surreptitiously and illegally forcing KITANI's treating physicians to provide them with medical information about KITANI's visits in January 2017 COSTA, CASSELLA and SYLDOR would resort to even more drastic measures to harass KITANI.

173.    On or about January 9, 2017, infuriated by KITANI's FMLA usage and her complaint to EEO,

COSTA, CASSELLA and SYLDOR arbitrarily insisted that KITANI immediately report to the MAC.

174.    As stated earlier, before KITANI had a chance to comply, COSTA, CASSELLA and SYLDOR would revoke her transit pass, throw papers containing disciplinary charges at her, have her immediately obtain her belongings and have her immediately escorted out of the building by security.

### Irregularities in Administrative Disciplinary Hearing Processes
### (OATH  & Civil Service Commission)

175.    KITANI received disciplinary charges from COSTA and CASSELLA in or about January 2017.

176.    In a further effort to retaliate against KITANI, the disciplinary proceedings lasted from February 2017 to August 2017.

177.    KITANI was out of work without pay from January 2017 to March 2018.

178.    Defendants' 15-month suspension of KITANI far exceeded the permissible 40 days of suspension without pay pending disciplinary proceedings permitted under the Collective Bargaining Agreement and Transit's Employee Policy.

179.    OATH also proceeded beyond its jurisdiction and in contravention of its policies.

180.    In or about January 20, 2017 Defendants' counsel, Michael Rabinowitz (RABINOWITZ) presented forged subpoenas to Jet Blue to obtain KITANI's flight itinerary under false pretenses.

181.    Despite notification from OATH that he had to obtain the signature of an administrative judge to use OATH subpoenas, on at least two occasions RABINOWITZ presented these fraudulent subpoenas to procure documents.

182.    RABINOWITZ presented these fraudulent subpoenas even after OATH judge Astrid Gloade (GLOADE) clearly stated that she would not grant the subpoena requests.

183.    RABINOWITZ had nevertheless presented the subpoenas to JetBlue and used the ill-gotten documents to manufacture charges against KITANI.

184.    Despite such an egregious infraction and despite  being duly noted on the record on several

occasions, GLOADE allowed the disciplinary proceedings to move forward.

185.    GLOADE allowed the proceedings to move forward despite the fact that at least 3 of the 7

specifications against KITANI were premised on these fraudulently obtained subpoenas.

186.    GLOADE also ruled in favor of Defendants and suspended KITANI forty days without pay even

though Defendants failed to meet their burden of proof regarding KITANI's leave usage.

187.    The record was clear that Defendants did not keep adequate time records.

188.    The record consisted of at least 4 different versions of KITANI's timesheets, two of which were

produced by KITANI herself.

189.    At least two of the specifications involved KITANI's alleged willful abuse of time and leave and

her alleged disregard for management's warnings that she had exceeded her leave balances.

190.    The determination of whether KITANI had in fact exceeded her leave balances would have been

impossible if Transit did not have accurate or complete time records.

191.    However, despite these realities GLOADE found that Transit had met their burden and found for

Defendants.

192.    GLOADE also ignored substantial evidence regarding the allegations that KITANI allegedly

failed to report to the MAC.

193.    The record clearly stated that KITANI's transit pass had been revoked.

194.    The record clearly stated and proved that KITANI could not access the MAC without her transit

pass.  KITANI, COSTA and CASSELLA all testified that she could not access the MAC facilities

without a pass.

195.    The record also clearly showed that even had KITANI had a pass, COSTA, CASSELLA and

SYLDOR failed to provide her with the documentation she needed to undergo the MAC evaluation

they demanded.

196.    Despite this evidence, GLOADE also determined that KITANI willfully refused to go to the

MAC, even though it would have been impossible for her to obtain entry to the building without the

very pass that COSTA and CASSELLA had demanded from KITANI.

197.    KITANI subsequently filed an appeal with the Civil Service Commission (CSC) on the bases

stated herein.  Like OATH the CSC refused to address RABINOWITZ's malfeasance.

198.    The CSC also refused to address GLOADE's determinations as it pertained to NYCTA's

timekeeping procedures and the MAC.

199.    Lastly, the CSC and OATH failed to address NYCTA's 15-month suspension without pay, in

direct violation of the collective bargaining agreement and Transit's policies.

200.    Although GLOADE acknowledged NYCTA's malfeasance and acknowledged her ability to

rectify the situation, GLOADE nevertheless took the position to refrain from doing so.

201.    As such, KITANI was denied her rights to due process.


### NYCTA Breached CBA When it Failed to Pay Kitani for 15 Months & Local 375 Breached its Duty of Fair Representation when It Failed to Grieve

202.    NYCTA breached the CBA when it failed to compensate KITANI when her suspension went

beyond 40 days.

203.    As discussed herein, KITANI was suspended without pay for over 15 months.

204.    To this day, KITANI has not been adequately compensated since her return to work in March

2018.

205.    Accordingly, KITANI has repeatedly asked  PATEL of Local 375 to grieve the payroll issues and

violations of the collective bargaining agreement described herein.

206.    Until the end of 2018, LOCAL 375 has either convened meetings or ignored KITANI's requests

without actually filing a grievance against NYCTA.

## V.  REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS

207.    If PLAINTFF prevails, she is entitled to an award of attorney fees, expert fees and costs pursuant to  42 U.S.C. § 1988.

## VI.  DEMAND FOR TRIAL BY JURY

208.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure PLAINTIFF demands a trial by jury in this action.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM OF RELIEF
### UNEQUAL PAY/RETALIATION
### IN VIOLATION OF THE EQUAL PAY ACT
### (against CITY/NYCTA)

209.    Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

210.    Plaintiff works at the same job site as her male comparators: NEIS, , PETIT-FRERE, HASAN, PERSAUD and ATTAH.

211.    Despite  having different civil service titles, Plaintiff performs substantially equal work, they all inspected Transit properties on a 24/7 on call basis.

212.    Upon information and belief, Plaintiff's colleagues have different civil service titles because at one time or another they were either unable to pass the examination for professional engineer certification.

213.    Plaintiff and her comparators also performed in substantially equal working conditions: they were all tasked with inspecting Transit properties when Plaintiff started in MOW and before she was

retaliated against and removed from 24/7 offsite field inspections altogether.

214.    Despite these similarities, Plaintiff's take home pay was anywhere from 50K to 80K less than her male comparators.

215.    Despite her superior credentials and experience. 20 years for Plaintiff and none for NEIS, NEIS was picked up off of the civil service list after placing 732 out of 788 examinees.

216.    When Plaintiff complained about the disparate pay and discriminatory denial of over time based on her gender, CASSELLA, COSTA and SYLDOR retaliated against her.

217.    Like NEIS Plaintiff interviewed for positions after she passed the examination. However in further retaliation of Plaintiff's request for FMLA and complaints of discrimination CASELLA, COSTA and SYLDOR worked in concert to ensure that Plaintiff would not have an opportunity to be promoted.

218.    CASELLA, COSTA and SYLDOR intentionally and arbitrarily suspended Plaintiff in order to ensure that she could not be promoted like NEIS her lesser qualified and lesser experienced male comparator.

219.    As a result of the foregoing, Plaintiff's pension has been affected. She has also lost wages, benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life, and has incurred damages.

220.    Plaintiff is also seeking that her salary be increased to the level of her male counterparts; that she be granted over time and field work in compliance with the CBA; that she be awarded liquidated, compensatory and punitive damages.

**SECOND CLAIM OF RELIEF
INTERFERENCE AND RETALIATION
IN VIOLATION OF THE FMLA
(against CITY/NYCTA)**

221.    Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

222.    Defendants are employees within the meaning of the FMLA.

223.    Section 102(a)(1)(D) of the FMLA requires that an "eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period… because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

224.    Plaintiff's medical condition constituted a serious health condition as that term is defined by 29 U.S.C. § 2611(11).

225.    Plaintiff suffers from debilitating migraines that warranted both intermittent and at times continuous FMLA leave.

226.    Section 105(a) of the FMLA, protects employees in the exercise of these rights: "(1) It shall be unlawful for any employer to interfere with, restrain or deny the exercise or the attempt to exercise, any right provided under this title; (2) It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a).

227.    Defendants interfered with Plaintiff's right to take a federally protected leave of absence under the FMLA beginning in June 2016.

228.    Plaintiff was eventually approved for continuous FMLA between July 2016 and August 2016. Defendants retaliated against Plaintiff in:

   a)   September 2016 when they refused to grant her bereavement leave like others in her unit. Plaintiff experienced 10 days of unpaid leave and being marked AWOL for those days.

   b)   Between August 2016 and October 2016 CASSELLA and COSTA attempted to

illegally force Plaintiff's treating physicians to provide them with information about Plaintiff's medical condition.

c) October 2016  CASSELLA engaged in the adverse employment action of refusing to approve Plaintiff's Professional Engineering certification.

d) November 2016 CASELLA and COSTA engaged in the adverse action of changing all of Plaintiff's prior approved leave time to AWOL; they also arbitrarily declared that PLAINTIFF had exceeded her leave balances.  At this juncture NYCTA never told PLAINTIFF how they calculated the calendar year. NYCTA did not and could not tell KITANI about her leave balances because they did not have adequate payroll records.

e) In January 2017 CASELLA, COSTA and SYLDOR attempted to force Plaintiff to go for involuntary testing at the Medical Assessment Center (MAC).  Although they refused to provide KITANI with adequate documentation and revoked her pass to access the MAC, CASSELLA, COSTA and SYLDOR suspended Plaintiff for over 15 months without pay in direct violation of the CBA.

f) As a result of Plaintiff's indefinite suspension,  CASSELLA, COSTA and SYLDOR denied her the same promotional opportunity as her colleague NEIS who had also passed a civil service examination.

229.    As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages, benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life, and has incurred damages.

### THIRD CLAIM OF RELIEF
### STIGMA PLUS/DENIAL OF DUE PROCESS, PRIVACY VIOLATIONS & DISPARATE TREATMENT BASED ON GENDER IN VIOLATION OF THE 14TH AMENDMENT/1983 (against CITY, NYCTA and LOCAL 375)

230.    Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

231.    COSTA made a statement that was injurious to Plaintiff's reputation: that she was abusing FMLA and stealing time, both of which were false and can be proven to be false.

232.    COSTA's statements denied KITANI of a promotional opportunities within the agency, especially when she was indefinitely suspended during the time she would have been picked up off of the civil service list.

233.    Due to COSTA's injurious statements and "investigation" KITANI went unpaid for 15 months in violation of the CBA limit of a maximum of only 40 days unpaid leave.

234.    Consequently, COSTA's false claim that Plaintiff abused FMLA/was stealing time constituted a stigma when she was placed on involuntary leave for 15 months without notice and hearing under Civil Service law 72, as such COSTA's statements about Plaintiff constituted an additional deprivation.

235.    COSTA, CASELLA and NYCTA transit also violated her right to privacy when they attempted force KITANI's treating physicians to provide them with access to her medical records and information without her authorization or her signed HIPPAA releases.

236.    COSTA, CASSELLA and NYCTA transit engaged in this misconduct on several occasions and when they were unsuccessful, they attempted to force KITANI to go to MAC for medical assessment.

237.    KITANI's rights under the 14th Amendment were also violated when CASSELLA and SYLDOR denied her over time opportunities, field work, training opportunities, and paid her lower than her male comparators, despite her superior qualifications and experience.

238.    As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages, benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and

loss of enjoyment of life, and has incurred damages.

## FOURTH CLAIM OF RELIEF
## MONELL LIABILITY/1983
## (against all Defendants)

239.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

240.    NYCTA/CITY failed to address Plaintiff's multiple complaints of discrimination and grievances.

241.    CASSELLA, COSTA and LOCAL 375 refused to address Plaintiff's out of title grievances based on gender discrimination and retaliation. The aforementioned also worked in concert to ensure that she would be denied promotional opportunities after she passed the Administrative Engineer civil service examination.

242.    Plaintiff complained to Andy Byford (BYFORD) (NYCTA's Chief Executive Officer), NYCTA's EEO Office along with CASSELLA, COSTA and Local 375.  BYFORD as final policymaker for the agency's EEO complaints and grievances repeatedly allowed Plaintiff to be wrongly disciplined and allowed her internal EEO complaints to go unaddressed.

243.    Upon information and belief, BYFORD also knew of and signed off on Plaintiff's wrongful 15-month unpaid suspension from the agency.

244.    BYFORD as NYCTA's Chief Executive Officer for the agency's grievance process would also permit a pattern of manufactured disciplinary charges against Plaintiff.

245.    EEO Complaints and grievances are within BYFORD's final policymaking authority.  He is the ultimate decisionmaker for both EEO complaints and grievances.  He makes the determination of whether the recommendation for discipline is adopted after either an investigation or an OATH hearing.

246.    As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages,

benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and

loss of enjoyment of life, and has incurred damages.


**FIFTH CLAIM OF RELIEF
IN VIOLATION OF DUTY OF FAIR
REPRESENTATION (SECTION 301)
LMRA SECTION 185 (301 HYBRID)
(against Local 375 & NYCTA)**

247.    Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

248.    LOCAL 375 acted in an arbitrary and discriminatory fashion and in bad faith when it failed to

file grievances on KITANI's behalf.

249.    KITANI filed multiple grievances alleging disparate pay and out of title work based on her

gender and LOCAL 375 refused to file grievances on her behalf.

250.    NYCTA breached the collective bargaining agreement when it suspended KITANI for over 15

month without pay.  The CBA only permits 40 days of unpaid leave when disciplinary charges are

pending.

251.    LOCAL 375 arbitrarily ignored KITANI's meritorious grievance surrounding the 15 months of

unpaid leave.

252.    There is a causal connection between NYCTA and LOCAL 375's behavior and KITANI's

deprivation:  she was not paid for 15 months and then only received a 1/3rd of her salary to date.

253.    LOCAL 375 were aware of KITANI's numerous complaints of gender discrimination and

FMLA allegations and still failed to act accordingly.

254.    Upon information and belief, LOCAL 375 has not denied other male members who have

grieved similar claims.

255.    As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages,

benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and

loss of enjoyment of life, and has incurred damages.

**SIXTH CLAIM OF RELIEF:**
**CONSPIRACY**
**VIOLATION OF**
**1985(3)**
**(all Defendants)**

256.    Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

257.    By the acts and practices described above, DEFENDANTS have worked in concert to deprive

PLAINTIFF of his rights based on his age.

258.    DEFENDANTS acted in concert when they attempted to force Plaintiff to go to the MAC on or

about January 9, 2017.

259.    LOCAL 375, NYCTA, CASSELLA, COSTA and SYLDOR worked together with others push

Plaintiff to go to the MAC or face indefinite suspension from NYCTA.

260.    COSTA and LOCAL 375 worked in concert to ensure that Plaintiff would face charges for

allegedly stealing time.

261.    Despite Plaintiff's multiple entreaties, LOCAL 375 refused to grieve COSTA's disciplinary

charges based on COSTA's false allegation that KITANI stole time and or abused FMLA.

262.    Defendants' actions resulted in her suspension without pay for 15 months, which was well over

the 40-day permitted period.

263.    This suspension denied Plaintiff of a property right that she had as a permanent civil servant.

264.    Specifically, Defendants defamed Plaintiff, suspended her without pay and banned her from the

premises.

265.     Accordingly, Defendants' actions also resulted in Plaintiff being denied promotional opportunities.  Again Defendants worked in concert to ensure that Plaintiff was not at work to capitalize off of her placement on the civil service examination list.

266.     Plaintiff applied for a number of positions for which she was eligible and because she was indefinitely suspended and banned from NYCTA premises, she could not go out on these interviews.

267.     As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages, benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life, and has incurred damages.


**SEVENTH CLAIM OF RELIEF:**
**DEPRIVATIONS UNDER ARTICLE 78**
**(Against NYCTA, LOCAL 375 and OATH)**

268.     Plaintiff hereby repeats and re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

269.   Pursuant to CPLR § 7803(2) Defendants' conduct set forth above was undertaken without or in an excess of jurisdiction.

270.   Specifically, RABINOWITZ's use of forged subpoenas to institute disciplinary proceedings rendered the entire proceedings undertaken by Defendants improper and requires that they be dismissed as a nullity *nunc pro tunc*.

271.   By reason of such wrongful conduct, KITANI has been: denied pay for 15 months; paid almost a 1/3rd of her current salary due to Defendants' ongoing wrongful acts; been denied promotional opportunities; and has experienced a reduction in her pension and health care benefits.

272.   For the reasons described herein, pursuant to CPLR § 7803(3) OATH's decision was arbitrary and

capricious and an abuse of discretion.

273.  GLOADE repeatedly ignored the record evidence: that NYCTA's inability to provide adequate time records (they had at least 4 copies of Plaintiff's timesheets) rendered any charges against her involving time and leave meritless.

274.  GLOADE also repeatedly ignored the record evidence and testimony that KITANI could not go to any MAC assessments without her transit pass, which Defendants took away from her before she could comply with their directives.

275.  Again, Plaintiff could not go to the MAC without a pass. Again this pass was taken by COSTA, CASSELL and SYLDOR before she could even attempt to go to the MAC.

276.  For the reasons described herein, pursuant to CPLR § 7803(4) Defendants' conduct resulted in a determination and a punishment that was not, on the entire record supported by substantial evidence.

277.      As a result of the foregoing, Plaintiff's pension has been affected.  She has also lost wages, benefits, promotional opportunities, and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life, and has incurred damages.  Plaintiff thereby seeks that the aforementioned disciplinary charges be removed from her personnel file, that she be compensated with interest for her wrongful suspension, and that she be promoted to any similar positions that were available during the 2-year period after she passed the civil service examination.

## VIII.      PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays that this Court grant her judgment containing the following relief:

a.  Impanel a jury to hear Plaintiff's claims;

b.  Costs and disbursements of this action;

c.  An award of damages in an amount to be determined upon the trial of

this matter to compensate Plaintiff for her monetary losses and damages, including Plaintiff's loss of past and future earnings, bonuses, compensation and other employment benefits;

d.  An award of damages to compensate Plaintiff for mental anguish, humiliation, embarrassment and emotional injury for each cause of action;

e.  Reversal and removal of any disciplinary record from Plaintiff's file;

f.  An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for violations of her rights under: the 14th Amendment of the United States Constitution's Equal Protection Clause; 42 U.S.C. § 1985; 42 U.S.C. § 1983; the Family Medical Leave Act (FMLA 29 U.S.C.A. §§ 2601 et. seq.); the Equal Pay Act (EPA); 29 U.S.C. § 206 et. al.,; Labor Management Relations Act (LMRA), 29 U.S.C. § 185 ("Section 301") and CPLR §§ 7801 et. al.;

g.  An award of punitive damages to be determined at the time of trial for each cause of action, by reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants herein-above alleges;

h.  An order prohibiting Defendants from continuing or maintaining the policy, practice and/or custom of discrimination and retaliation based on gender or FMLA status; and

i.  Such other and further relief as this Court may deem just and proper.

33

Dated:  Queens, New York
        February 11, 2019                        Respectfully submitted,


                                                        /s/


                                        _____
                                        SPECIAL HAGAN, ESQ.
                                        LAW OFFICES OF SPECIAL HAGAN
                                        196-04 Hollis Avenue
                                        Saint Albans, New York 11412
                                        (917) 337-2439
                                        special@haganlawoffices.net

34