UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MIKIKO KITANI,

                              Plaintiff,

               -against-

NEW YORK CITY TRANSIT, a public benefit
corporation; CRAIG COSTA, in his individual
capacity and in his official capacity as Director of
NEW YORK CITY TRANSIT; ANTHONY
CASSELLA, in his individual capacity and in his
official capacity as an Assistant Chief Officer of
NEW YORK CITY TRANSIT; and PIERRE A.
SYLDOR, in his individual capacity and in his
official capacity as a Senior Director of NEW YORK
CITY TRANSIT; jointly and severally,

                              Defendants.

Case No. 1:19-cv-01043 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

Defendants New York City Transit ("NYC Transit"), Craig Costa ("Costa"), Anthony

Cassella ("Cassella"), and Pierre A. Syldor ("Syldor") (collectively, "Defendants") move

under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on claims brought

by *pro se* Plaintiff Mikiko Kitani ("Kitani" or "Plaintiff") for alleged violations of the Family

and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615(a)(1)-(2), and the New York

Labor Law ("NYLL"), N.Y. Lab. Law § 193.  Dkt. 134.  For the reasons set forth below, the

Court GRANTS Defendants' motion.

## BACKGROUND

Except where noted, the following facts are undisputed and drawn from the parties'

Rule 56.1 Statements and Responses, *see* Dkt. 142 ("Dfs. SUF"); Dkt. 150 at 1-14 ("Pl.

RSUF"); Dkt. 150 at 14-19 ("Pl. SUF"), the declarations of Steve S. Efron and Mikiko Kitani,

*see* Dkt. 135 ("First Efron Decl."); Dkt. 139 ("Second Efron Decl."); Dkt. 140 ("Third Efron

Decl."); Dkt. 151 ("Kitani Decl."), and the exhibits attached thereto, *see* Dkts. 135-1 to -14; Dkt. 140-1.

## I.    Factual Background

### A.  The Parties

Kitani is a professional engineer licensed in New York.  Dkt. 135-1 ("Kitani Dep. Tr.") 75:24-76:5.  She was hired by NYC Transit as a civil engineer in or about September 2013, and began working for the Maintenance of Way Division ("MOW") in May 2014.  Pl. RSUF ¶ 1; Dkts. 135-7 to -12 ("Oath I Tr.") 41:15-23; Oath I Tr. 905:21-906:4.  Kitani's duties with the MOW involved providing technical support to the Department of Subways, including "performing visual inspections of New York City transit structures, as well as respond[ing] to trouble calls or emergency calls that need an engineer and technical expertise."  Oath I Tr. 454:20-455:4; *see also* Pl. RSUF ¶ 3; Dkt. 135-13 at 25-26 (NYC Transit's list of job responsibilities for civil engineering position).

Kitani suffers from chronic migraine disease.  Pl. RSUF ¶ 6; Dkt. 135-14 ("Oath II Tr.") at 187:6-10.  She was diagnosed in the early 2000s and her symptoms include pounding headaches, nausea, and vomiting.  Oath II Tr. 187:6-188:7.  When her symptoms were minor, Kitani was able to remain at work, but at times, her symptoms became "incapacitating and debilitating."  Oath II Tr. 188:1-7.

Syldor became Kitani's supervisor in March 2016, and serves as acting senior director at the MOW.  Oath I Tr. 318:11-18, 347:7-12.  Cassella, Syldor's supervisor,  has been the assistant chief engineering officer for the MOW since 2014.  Oath I Tr. 454:15-19, 457:1-8; *see* Oath I Tr. 337:12-21.  Costa serves as a director of labor relations and supports a subset of units at NYC Transit, which does not normally include the MOW.  Oath I Tr. 40:14-41:4, 121:2-4.  His role involved "provid[ing] guidance to management regarding employment and

labor issues," and "work[ing] with the unions and employees to resolve problems [relating to] everything from payroll . . . to contractual issues."  Oath I Tr. 40:19-23.

### B.  The Underlying Events

In or about August 2014, Kitani submitted an FMLA application to take intermittent leave due to her chronic migraines.  Oath II Tr. 191:18-21; Dkt. 135-13 at 18-24.  Her application for intermittent FMLA leave was approved for a twelve-month period between September 3, 2014 to September 2, 2015, and was again approved for twelve-month periods beginning in September 2015 and September 2016.  Pl. RSUF ¶¶ 13-14; *cf.* Kitani Decl. at 4.  An employee with approved FMLA leave may take up to twelve weeks, or sixty days, of leave during the twelve-month period.  29 U.S.C. § 2612(a)(1); *see also* Kitani Decl. at 9.

On February 9, 2016, Kitani and her union representative attended a meeting with Costa and Cassella. The meeting was scheduled to review a complaint filed by Kitani regarding her removal from some work schedules and to discuss FMLA leave and/or requesting a reasonable accommodation under the Americans with Disabilities Act of 1990 ("ADA").  *See* Oath I Tr. 67:6-68:23, 133:24-134:21; *see also* Oath I Tr. 1115:6-7; Dkt. 135-2 to 135-3 ("Oath I R&R") at 17 (Kitani was temporarily taken off her department's 24/7 emergency call list in December 2015); Oath I Tr. 1115:8-9; Oath I R&R at 17 (Kitani temporarily taken off her department's daytime field work list in January 2016).[1]  At that meeting, Costa provided Kitani with forms to apply for an accommodation under the ADA; Cassella followed up the same day by also sending Kitani a blank reasonable accommodation

---

[1] While Costa's role normally did not involve supporting the MOW, he testified that the normal director of labor relations for the MOW was out sick when Kitani's first complaint occurred and that he handled the complaint at the request of another employee.  Oath Tr. 121:5-17.  He testified that he "stuck with" the "Kitani situation" and "didn't punt it back."  *Id.*

form.  Oath I Tr. 67:6-68:23; *see also* Kitani Decl. at 28 (e-mail from Cassella to Kitani

forwarding her an accommodation form); Kitani Decl. at 30-33 (copy of blank

accommodation form).  After speaking with her doctor, Kitani did not apply for a reasonable

accommodation.  Pl. RSUF ¶ 16; Kitani Dep. Tr. 13:25-14:14.

 Kitani thereafter increased her use of intermittent FMLA in 2016.  Pl. RSUF ¶ 14; *see*

Oath I Tr. 935:12-936:10.  Kitani's records reflect that in the first half of 2016, she took

FMLA leave once in January 2016, twice in March, six times in April, five times in May, and

four times in June, often for entire days.  *See* Dkt. 135-4 at 5-9.  In June 2016, Kitani put in an

application for continuous FMLA leave for an eight-week period between July 11, 2016 to

September 2, 2016.  Oath I Tr. 936:11-21.  After Kitani began her continuous leave, she

received conflicting letters from NYC Transit's Business Service Center regarding the

approval of her leave.  Oath I R&R at 24; Oath I Tr. 953:13-25.  Kitani returned to work on

July 27, 2016 to try to resolve the issue with her continuous leave.  Oath I Tr. 953:13-25.  The

problem was resolved on August 15, 2016.  Oath I Tr. 954:18-20.  Kitani then took

continuous FMLA leave from August 16, 2016 to September 2, 2016.  Oath I Tr. 962:14-25.

 At some point during Kitani's August 16, 2016 to September 2, 2016 continuous leave

period, Kitani traveled from New York to stay with her parents in Portland, Oregon.  Kitani

Dep. Tr. 39:2-11.  She asserts that this was so that her parents could "take care of [her]."  *Id.*

She then took vacation days from September 6, 2016 to September 9, 2016.  Oath I Tr.

955:2-5.  On or about September 9, 2016, Kitani requested bereavement leave to attend the

funeral in Japan for her uncle who had passed away on September 6, 2016.  Pl. RSUF ¶ 17;

Oath I Tr. 75:20-23; Oath I Tr. 964:21-966:15.  She was granted bereavement leave on the

condition that she provide documentation substantiating the need for leave, including a death

certificate in English and her travel itinerary.  Pl. RSUF ¶ 18; Oath I Tr. 80:9-25.  Kitani

traveled to Japan from September 12 to September 20, 2016.  Oath I Tr. 975:22-24.  Upon her return, Kitani submitted documentation of her round-trip ticket between Portland and Japan and a death certificate in Japanese, but did not submit documentation of her flight from New York to Portland.  Oath I Tr. 80:9-82:21, 209:9-17.  Costa and Cassella assert that, in addition to being concerned about the timing of her bereavement leave request at the end of her vacation leave, they were also concerned that Kitani was traveling to Portland for vacation during her FMLA leave; therefore, on September 27, 2016, they requested documentation of her New York-to-Portland journey.  Oath I Tr. 80:9-82:21, 93:17-22; Oath I Tr. 519:12-19; *see* Oath I R&R at 9.  Kitani submitted an English translation of her uncle's death certificate on September 29, 2016, but did not submit her New York-to-Portland travel information as requested.  *See* Oath I Tr. 1107:8-19, 1308:2-6.

On October 12, 2016, Syldor informed Kitani by e-mail that she should "[p]lease be ready to do benchwall inspection on Friday night October 1[3], 2016 from 10pm[]to 6am." Kitani Decl. at 26.  A few minutes later, Tony DiRuggiero ("DiRuggiero"), a Senior Director of Structural Inspections, replied to Syldor and Kitani, noting that Kitani had not "performed these inspections in about a year," and stating that they should plan to "assign someone to go over the new forms and procedures [with Kitani] and review the bulletin."  Kitani Decl. at 37. Kitani replied and stated that she was "unable to perform this Friday 10/15 [*sic*] 10 PM ~ Saturday 10/16 [*sic*] 6AM overnight shift, regrettably.  Thank you for considering me for this opportunity."  Kitani Decl. at 26.  On October 13, 2016, Syldor again directed Kitani by e-mail to perform the tube inspection for the Canarsie tube that evening with the engineering team from 10 p.m. to 6 a.m.  Kitani Decl. at 24.  Kitani replied to his e-mail and again informed him that she could "not do the scheduled Canarsie tube inspection tonight," and "hope[d] to assist in the upcoming overtime chance when possible."  Kitani Decl. at 23.

Syldor replied, informing her that "[i]t [was] a mandated inspection. We are short of engineers for the inspection. For the past nights our daytime engineers were there to continue the inspection. Please provide an explanation to why you cannot help tonight." Kitani Decl. at 23. Kitani replied, stating only: "This email confirms that, as per our verbal conversation, I do not have to do tonight's overnight shift — Thursday 10/13 10PM to Friday 10/14 6 AM." Kitani Decl. at 23.[2]

A couple of weeks later, Costa held a meeting with Cassella, Syldor, Kitani, and Kitani's union representative on October 26, 2016, because Kitani still had not submitted the requested travel itinerary regarding her trip to Portland. Oath I Tr. 92:20-95:15. At the meeting, Kitani was directed to submit a written statement by October 31, 2016, indicating when she traveled from New York to Portland, and was again directed to submit travel documentation of that leg of her journey. Oath I Tr. 1294:8-10; Oath I Tr. 523:3-524:3. The same day, Syldor sent Kitani another ADA accommodation form "to be filled out and submitted if needed," and asked that she "please inform [Syldor] and Mr. Cassella if you do not intend to apply for this accommodation," "[s]ince the application [was] not mandatory." Kitani Decl. at 35.

On October 27, 2016, Kitani took FMLA leave and was absent until November 15, 2016. Oath I Tr. 524:4-14; Oath I Tr. 1005:10-13. When Kitani returned to work on November 15, 2016, her supervisors renewed the request that she submit her written statement and documentation of the New York-to-Portland leg of her journey, and asked for it within twenty-four hours. Oath I Tr. 524:4-14. Kitani then took FMLA leave again from November

---

[2] While there are some discrepancies about the date of the inspection in the e-mails discussed herein, ALJ Gloade found that the e-mails above all refer to an inspection on October 13, 2016. *See* Oath I R&R at 15 n.3. The parties do not dispute this in their papers here.

16 to November 18, 2016.  Dkt. 135-4 at 14.  Kitani did not submit anything in response to her supervisors' requests until November 21, 2016, when she submitted a fifteen-page document that reflected her description of the meeting that took place on October 26, 2016, but did not include information about, or documentation of, her travel from New York to Portland.  Oath I Tr. 96:7-99:4; Oath I Tr. 524:23-526:10; Oath I Tr. 1308:2-6 (Kitani: testifying that she had not submitted the itinerary of her travel from New York to Portland as of November 21, 2016).

Kitani was informed on November 21, 2016 that she had exhausted her available FMLA leave as of November 4, 2016 and that she would be required to adhere to normal timekeeping procedures, including documentation of sick leave for any absences after November 7, 2016.  Oath I Tr. 507:24-508:13.  Despite this instruction, Kitani continued to charge leave time as FMLA leave between November 28, 2016 and January 9, 2017, and did not submit documentation of sick leave, as required by NYC Transit's timekeeping procedures.  Oath I Tr. 513:24-514:6; *see* Oath I Tr. 1217:4-1218:22 (Kitani admitting that she did not provide sick leave documentation for the leave she took after being informed she had exhausted her FMLA leave).  On December 16, 2016, Kitani instead submitted a memorandum about Defendants' investigation into her bereavement leave, but still did not provide the itinerary of her travel between New York and Portland.  Oath I R&R at 11.

On January 4, 2017, Kitani sent an e-mail to Syldor in the morning informing him that she was running late, but would be in the office.  Oath I Tr. 1222:8-1223:4.  Syldor e-mailed her that afternoon when she had not yet reported to the office.  *See* Oath I Tr. 398:13-17; Oath I R&R at 30.  Kitani replied later, informing him that she would not be coming into the office and was taking FMLA leave because she passed out while she was getting ready.  Oath I Tr. 1222:8-1223:4.

Syldor, asserting that he was concerned about Kitani's report of fainting, forwarded her e-mail to Cassella, who told Syldor to refer Kitani to the Medical Assessment Center ("MAC") for an "ability to perform" medical evaluation.  Oath I Tr. 339:17-340:14, 398:13-400:10, 402:3-4.  Cassella stated that he recommended this evaluation because Kitani's responsibilities involved working around moving trains and a live third rail, entering manholes and vent gratings, and climbing structures that required assessment.  Oath I Tr. 527:19-529:12.  Cassella consulted with Costa and Dr. Lim, the head doctor at NYC Transit's Occupational Health Services, in making his recommendation.  Oath I Tr. 529:13-530:3; *see* Oath I Tr. 70:9-13.

On January 5, 2017, Syldor directed Kitani to report to the MAC for an evaluation. Oath I Tr. 1406:13-24.  Kitani e-mailed Syldor at 11:30 a.m. asking for a G-46 form that would include a written statement explaining the need for the evaluation.  Oath I Tr. 102:9-24; Oath I Tr. 1348:6-15; Oath I R&R at 31.  Syldor replied at 11:39 a.m., informing her that she "must go now" and advising her that the written statement would be sent.  Oath I Tr. 1348:16-20; *see* Oath I R&R at 31.  Kitani informed him at 11:50 a.m. that she was reviewing the G-46 form, it did not state she needed to go to the evaluation "now," and that she believed she had the right to obtain additional referral information before deciding to attend any medical examination.  Oath I Tr. 1348:21-25; *see* Oath I R&R at 31.  Syldor again directed her to go to the MAC for her evaluation and informed her any further documentation she was requesting could be provided to her there.  Oath I Tr. 530:18-531:11; *see* Oath I R&R at 32. Kitani did not go to the MAC on January 5, 2017.  Instead, she claimed FMLA leave the following day and did not report to work.  Oath I Tr. 105, 531-532.

When Kitani returned to work after the weekend, on January 9, 2017, she was summoned to another meeting with Costa, Cassella, Syldor, and her union representative, and

was again directed to report to the MAC for the ability-to-perform evaluation.  She was warned that if she did not report for the evaluation, she would be taken out of service, suspended, and brought up on disciplinary charges.  Oath I Tr. 105:19-107:10, 340:7-342:17, 531:12-532:11.  Costa asserts that Kitani told him to "go ahead and do it," or words to that effect.  Oath I Tr. 105:19-107:10.  After Kitani again refused to go to the MAC, Defendants suspended Kitani on January 9, 2017, and initiated disciplinary charges.  Pl. RSUF ¶ 44; Oath I Tr. 531:18-532:11.  A seven-day disciplinary hearing was held before Administrative Law Judge Astrid B. Gloade ("ALJ Gloade") of the Office of Administrative Trials and Hearings ("Oath Hearing").  Kitani Dep. Tr. 36:4-7; *see* Oath I R&R at 1.  Kitani was represented by counsel.  *See* Kitani Dep. Tr. 19:16-20:5.  On February 14, 2018, ALJ Gloade found that NYC Transit had established most of the charges and recommended that Kitani be suspended without pay for forty days.  Oath I R&R at 1.

Kitani returned to work after her suspension on March 12, 2018.  *See* Oath II Tr. 72:2-73:2.  That day, Casella circulated a memorandum titled "M. Kitani Return to Work Reinstruction," which summarized certain reminders that needed to be "discussed and acknowledged by Ms. Kitani and witnessed by MOW Engineering Management, Union Representation, and Labor Relations."  Kitani Decl. at 41.  Among the reminders on the memorandum were that "Kitani shall perform any and all work assignments (office work and field work), as required by any Civil Engineer working in MOW Engineering," and that "[a]ll rules for sick time, vacation, or other required absence shall be adhered to."  Kitani Decl. at 41.  The memorandum was signed by Kitani's union representative, Costa, and Syldor; Kitani refused to sign her acknowledgment.  Kitani Decl. at 41.

On March 19, 2018, Kitani submitted an application for FMLA leave. Oath II Tr. 195:1-3; Dkt. 140-1 ("Oath II R&R") at 2 n.1. Kitani was told that the application was denied because she had not worked the requisite hours during the previous year. Oath II Tr. 195:1-5.

Between March 12 and May 10, 2018, Kitani was absent on seven occasions. Oath II R&R at 2-3. On May 10, 2018, Syldor issued a "Sick Counseling Memorandum," which advised Kitani that she had had "five (5) unsubstantiated instances of sick leave use in a running year" and that "less than half of her potential total sick leave balances remain." Kitani Decl. at 42. The memorandum informed Kitani that "the next instance of undocumented sick leave shall result in placement on the Chronic Sick List." Kitani Decl. at 42. Kitani refused to sign the employee acknowledgment on that memorandum. Kitani Decl. at 42. After May 10, 2018, Kitani was absent from May 14 to 18, May 21, May 31, and June 11. Oath II R&R at 2. She submitted doctor's notes in support of those absences. Oath II R&R at 2-3. On May 24, 2018, Syldor e-mailed Kitani and directed her to provide doctor certifications, rather than notes, for the sick days taken through May 21. Oath II R&R at 3. Her sick leave forms for her absences through May 10, 2018 were submitted on May 24, 2018 and updated later with doctor certifications. Oath II R&R at 3. Kitani also subsequently submitted sick leave requests after May 24, 2018 for her absences on May 14 to 18, May 21, May 31 and June 11. Oath II R&R at 3. On June 12, 2018, Kitani received a memorandum informing her that she had "six (6) or more unsubstantiated instances of sick leave absence in the past year and/or you have demonstrated a continuing pattern of one- or two-day absences." Kitani Decl. at 43. She was informed that therefore her "name ha[d] been placed on the Chronic Sick List." Kitani Decl. at 43. As a consequence of her placement on the Chronic Sick List, Kitani was required to "provide medical documentation for every future sick leave absence, whether paid or unpaid, in accordance with . . . the applicable labor agreement," and

was warned that "[f]ailure to produce such substantiation w[ould] result in denial of sick leave pay for the absence and appropriate disciplinary action." Kitani Decl. at 43. Further, Kitani's name was to "remain on the Chronic Sick List for a period of six (6) months," after which her sick leave record would be reviewed. Kitani Decl. at 43. Her name would be removed from the Chronic Sick List if she had had two or fewer instances of sick leave during the period, but if her instances of sick leave exceeded two instances, then her name would "remain on the Chronic Sick List and [she] m[ight] be subject to appropriate disciplinary action." Kitani Decl. at 43. Kitani did not sign the memorandum. Kitani Decl. at 43. Syldor e-mailed Kitani on June 12, 2018, advising her that a refusal to sign the memo could trigger disciplinary action. Oath II R&R at 4.

After being placed on the Chronic Sick List, Kitani was absent on six more occasions: June 19 to 20, June 22, June 26, July 6, July 10, and July 16, 2018. Oath II R&R at 4. Sick leave requests are required to be submitted within three days of the employee's return to work. Oath II Tr. 140:4-9. Kitani's sick leave requests were submitted several weeks after the absences took places, and the required doctor certifications were completed several weeks after she submitted her leave requests. *See* Oath II R&R at 4.

In or about July 2018, a NYC Transit employee visited Kitani's doctor, Dr. Halpern, to attempt to authenticate Dr. Halpern's letterhead and the certifications Kitani had submitted. Oath II Tr. 236:21-237:13. The NYC Transit employee asked if Kitani was a patient at the office; Dr. Halpern's staff would not confirm this without a release from Kitani. Oath II Tr. 41:20-25, 237:8-13.

On July 17, 2018, Defendants received sick leave requests Kitani had submitted for absences on July 6, 10, and 16, which were returned to her the same day because the forms did not have completed doctor certifications, as required because of Kitani's placement on the

Chronic Sick List, *see* Kitani Decl. at 43, and were submitted more than three days after her return to work. Oath II R&R at 4. On July 27, 2018, Kitani was sent a medical information release consent form, which she did not sign. Oath II Tr. 239:3-242:1.

Kitani was then absent for thirty-four workdays between July and December 2018. Oath II R&R at 4. Her sick leave requests were submitted weeks after the absences, and the related medical certifications contained later dates or lacked dates altogether. Oath II R&R at 4-5. In or about September 2018, Cassella again asked Kitani to sign a medical release for Dr. Halpern, which she did not sign. Oath II Tr. 236:21-237:7, 239:3-242:1.

On or about February 26, 2019, NYC Transit initiated another disciplinary action against Kitani, charging her with alleged insubordination, failure to submit sick leave documentation as required, and failure to cooperate with an investigation into the authenticity of medical documentation. Oath II R&R at 1; *see also* Pl. SUF ¶ 46; TAC ¶ 86. Following a two-day trial before Administrative Law Judge John B. Spooner ("ALJ Spooner"), at which Kitani was represented by counsel, ALJ Spooner found that the charges should be sustained and that Kitani should be suspended for thirty days. OATH II Report at 1; Kitani Dep. Tr. 43:19-20. In October 2019, Kitani resigned from NYC Transit and subsequently began work at a private company. Kitani Dep. Tr. 6:17-9:4, 12:23-13:24.

## II.    Procedural History

On February 1, 2019, Kitani brought suit against the City of New York, NYC Transit, the Office of Administrative Trials and Hearings, Local 375, Cassella, Costa, Syldor, and Andy Byford ("Byford"), the Chief Executive Officer of NYC Transit, alleging violations of the Equal Pay Act, the FMLA, and the Fourteenth Amendment. She also brought claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and N.Y. C.P.L.R. § 7803(2), as well as a hybrid claim for a violation of the Labor Management Relations Act ("LMRA") and the

collective bargaining agreement.  Dkt. 4 ¶¶ 215-283.  On April 26, 2019, Kitani filed her first

Amended Complaint, Dkt. 14, substituting Local 375 with Local 3652, and asking that the

Court relieve her counsel so that she could represent herself, Dkts. 6, 12.  On April 29, 2019,

Kitani's counsel requested to be relieved as counsel.  Dkt. 7.  On May 2, 2019, the Court

approved the requests, and Kitani is now proceeding *pro se*.  Dkt. 8.

On July 25, 2019, the City of New York filed a motion to dismiss the Amended

Complaint.  Dkt. 33.  On July 26, 2019, Local 3652 also moved to dismiss the Amended

Complaint.  Dkt. 37.  In response to the motions, the Court permitted Kitani to file a Second

Amended Complaint ("SAC") on September 30, 2019.  *See* Dkt. 53; Dkt. 54 (SAC).  The

SAC principally added claims for sex discrimination, hostile work environment, and

retaliation under Title VII of the Civil Rights Act of 1964, the New York State Human Rights

Law, and the New York City Human Rights Law; claims under 42 U.S.C. § 1981; claims for

violations of the ADA; and state law claims including NYLL violations, slander, defamation,

invasion of privacy, intentional infliction of emotional distress, breach of contract, and breach

of the duty of fair representation.  *See generally* SAC.  Kitani dropped all claims against the

City of New York.  *Id.*  On November 8, 2019, Byford, Cassella, Costa, Syldor, and NYC

Transit moved to dismiss certain claims in the SAC.  Dkt. 61.  On November 22, 2019, Local

3652 moved to dismiss the duty of fair representation claims and all claims arising under 42

U.S.C. § 1985.  Dkt. 65.  The Court granted the motions to dismiss, and dismissed the Title

VII, ADA, Equal Pay Act, Sections 1981 and 1985, intentional infliction of emotional

distress, defamation, and invasion of privacy claims; the Section 1983 claims against NYC

Transit and Byford; the FMLA claim against Byford; and the duty of fair representation

claims against Local 3652.  *See Kitani v. N.Y.C. Transit*, No. 19-cv-01043 (VSB), 2022 WL

874781, at *15 (S.D.N.Y. Mar. 24, 2022) ("*Kitani I*").  The Court granted Kitani leave to amend on or before April 24, 2022.  *Id.*

Kitani filed her Third Amended Complaint on April 22, 2022.  Dkt. 86 ("TAC" or "Third Amended Complaint").  The TAC asserts claims under the FMLA and the NYLL against NYC Transit, Costa, Cassella, and Syldor.  *See generally* TAC.  The case was reassigned to the undersigned on September 23, 2022.  Dkt. 97.  Following the close of discovery, Defendants moved for summary judgment on both counts of the TAC on May 31, 2024.  Dkt. 134; *see* Dkt. 141 ("Br.").  Following several extensions, Kitani filed her opposition on November 8, 2024, Dkt. 152 ("Opp."); and following an extension, Defendants submitted their reply on December 20, 2024, Dkt. 158 ("Reply").  The motion is thus fully briefed.

## LEGAL STANDARD

### I.  Motion for Summary Judgment

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or defense, the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law.'  A dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Rosen v. UBS Fin. Servs. Inc.*, No. 22-cv-03880 (JLR), 2023 WL 6386919, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact."  *JTRE Manhattan Ave. LLC v. Capital One, N.A.*, No. 21-cv-05714 (JLR), 2024 WL 3227010, at *8 (S.D.N.Y. June 27, 2024).  In ruling on a motion for summary judgment, "the court must view all evidence in the light most favorable to the non-

moving party, and resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Id.* (citation omitted) (internal quotation marks omitted).  To defeat a motion for summary judgment, the nonmoving party must advance more than "a scintilla of evidence," *Liberty Lobby*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When, as here, a *pro se* litigant is involved, "the same standards for summary judgment apply," *Williams v. Savoy*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015), but "[p]ro se litigants receive 'special solicitude' when 'confronted with motions for summary judgment,'" *Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023) (quoting *Graham v. Lewinski*, 848 F.2d 343, 344 (2d Cir. 1988)).  The Court "liberally construe[s] pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *Kravitz*, 87 F.4th at 119 (quoting *Publica v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022)).

## II.    FMLA Statutory Scheme

The FMLA allows eligible employees to take up to twelve work weeks of unpaid leave per year for the purposes specified in the statute, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  To be eligible for FMLA leave, the employee must have, among other things, "performed at least 1,250 hours of service with that employer in the twelve months prior to the beginning of [her] leave."  *Rodriguez v. Atria Senior Living Grp., Inc.*, 887 F. Supp. 2d 503, 513 (S.D.N.Y. 2012) (quoting *Porter v. Donahoe*, 484 F. App'x 589, 590 (2d Cir. 2012) (summary order)).  The FMLA permits employees to take intermittent leave when medically necessary.  29 U.S.C. § 2612(b)(1).  Intermittent leave may be taken in

"separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202(a); *see*

*McGuiness v. E.W. Indus.*, 857 F. Supp. 2d 259, 264 (E.D.N.Y. 2012) (same).

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise, any right provided under this subchapter." 29

U.S.C. § 2615(a)(1).  The FMLA creates a private right of action "to seek both equitable relief

and money damages against any employer . . . should that employer 'interfere with, restrain,

or deny the exercise of' FMLA rights."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d

Cir. 2006) (quoting *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003)).  The

Second Circuit recognizes both FMLA interference and retaliation claims.  *See Woods v.*

*START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017); *see also Tieu v.*

*N.Y.C. Econ. Dev. Corp.*, 717 F. Supp. 3d 305, 326 (S.D.N.Y. 2024) (same).

## DISCUSSION

## I.    FMLA Claims for Interference and Retaliation (Count I)

In Count I, Kitani brings claims against the Defendants under the FMLA, alleging that

they interfered with her FMLA rights and retaliated against her during her employment at

NYC Transit.  TAC ¶¶ 93-118.  Defendants move for summary judgment on Kitani's FMLA

claims, arguing that they are time barred and fail on the merits.  Br. at 10-17.

### A.    Legal Standard

The FMLA makes it "unlawful for any employer to interfere with . . . . the exercise of

or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant

denied or otherwise interfered with a benefit to which she was entitled under the FMLA."

*Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).  To prevail on a FMLA

interference claim, a plaintiff must establish that: (1) "she is an eligible employee under the

FMLA," (2) "the defendant is an employer as defined by the FMLA," (3) "she was entitled to take leave under the FMLA," (4) "she gave notice to the defendant of her intention to take leave," and (5) she was either "denied benefits to which she was entitled under the FMLA," *id.*, or the employer otherwise interfered with her FMLA benefits, *see Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 69 (2d Cir. 2024) ("[A]n employer can violate the FMLA merely by interfering with the employee's benefits under the FMLA without actually denying the employee's request for those benefits.").

FMLA retaliation claims are evaluated under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Graziado*, 917 F.3d at 429. To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that: (1) she "exercised rights protected under the FMLA"; (2) she "was qualified for [her] position"; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted).  "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziado*, 817 F.3d at 429 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

Claims under the FMLA are subject to a two-year statute of limitations unless the violations are willful, in which case the limitations period is three years.  29 U.S.C. § 2617(c)(1)-(2); *accord Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (per curiam).  "The FMLA does not define the term 'willful,' but the Second Circuit has held that an employer acts willfully when it knows its conduct is prohibited by the FMLA, or when

it acts with reckless disregard of that fact." *Reyes v. N.Y.C. Health & Hosps. Corp.*, No. 10-cv-01606 (WFK), 2012 WL 3764061, at *4 (E.D.N.Y. Aug. 29, 2012) (citing *Porter*, 392 F.3d at 531).

### B. Statute of Limitations Analysis

Kitani initiated this action on February 1, 2019.[3]  *See* Dkt. 1.  Kitani asserts that Defendants interfered with her FMLA rights when: (1) Defendants did not submit Kitani's timesheets in 2016 and therefore she was subsequently denied continuous FMLA leave between July and September 2016, Pl. SUF ¶ 40; (2) Defendants Costa and Cassella provided her with ADA reasonable accommodation forms in February and October 2016 in order to pressure her to stop using FMLA leave, Pl. SUF ¶¶ 37-38; (3) Defendants Cassella and Syldor excluded her from work assignments, training opportunities, and overtime work from February to October 2016, *see* TAC ¶ 48; and (4) Defendants suspended her in January 2017 so that she would not qualify for FMLA leave in 2018.  *See* Opp. at 4-11.

Kitani also claims that Defendants retaliated against her when they: (1) assigned her to overnight shifts after she returned from continuous FMLA leave in September 2016; (2) marked her AWOL when she did not work the October 13, 2016 overnight shift due to health concerns; (3) directed her to report for an ability-to-perform assessment in January 2017; (4) failed to provide her with a form G-46 in connection with that assessment; and (5) initiated disciplinary charges against her on January 9, 2017.  Opp. at 14-16.

---

[3] Even though Kitani's first attempt to file her complaint on February 1, 2019 was rejected due to a filing error, *see Kitani I*, 2022 WL 874781, at *3 n.4, the Court will treat Kitani's action as commenced on February 1, 2019.  *See Catozella v. PLS Rest. Inc.*, No. 18-cv-06660 (CS), 2019 WL 1897617, at *5 (noting that a complaint's "technical noncompliance with local or federal rules does not prevent the commencement of an action").

All of the aforementioned instances of interference and retaliation cited by Kitani in her brief began in 2016 and ended by January 2017. Because these claims are based on conduct that predates February 1, 2017, two years prior to the filing of her complaint, they are untimely. 29 U.S.C. § 2617(c)(1).

Kitani responds that her FMLA claims are subject to a three-year statute of limitations period because Defendants' alleged FMLA violations were willful. Opp. at 10; 29 U.S.C. § 2617(c)(2). The Court disagrees. Simply asserting that the conduct was willful is not enough. *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 320-21 (2d Cir. 2021) (under analogous Fair Labor Standards Act, a plaintiff must do more than "make the conclusory assertion that a defendant acted willfully" for three-year statute of limitations to apply (quoting *Crugher v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014)). Kitani has not set forth any evidence from which a reasonable jury could find that Defendants knew their conduct was prohibited by the FMLA, or acted with reckless disregard of that fact. *See Reyes*, 2012 WL 3764061, at *4 (concluding, on motion for summary judgment, that three-year limitations period did not apply where "[p]laintiff set[] forth no facts to demonstrate [d]efendants' conduct was 'willful'" and had "not provided evidence [d]efendants had actual knowledge they were violating the FMLA" or "disregarded their obligations under the FMLA").

Kitani's focuses on the "repeated nature of [Defendants'] acts" — in particular, twice providing Kitani with an ADA reasonable accommodation form — which, she asserts, "suggests a pattern of willful misconduct, rather than isolated or accidental mistakes." Opp. at 8; *see id.* at 7-8. There is no basis for a jury to find that Defendants violated the FMLA by offering Kitani reasonable accommodation forms, let alone that Defendants knew that they were violating the FMLA, or acted recklessly in that regard, when they provided such forms. While Kitani characterizes the provision of these forms as exerting pressure on her to seek an

Case 1:19-cv-01043-JLR    Document 159    Filed 02/11/25    Page 20 of 32


accommodation rather than take FMLA leave, *see* Opp. at 7, there is no evidence that Plaintiff was forced to seek an accommodation instead of FMLA leave. Indeed, the record reflects that Plaintiff was expressly told that the accommodation forms were "not mandatory." Kitani Decl. at 35. *See Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (explaining that allegations "founded on nothing more than Plaintiff's self-serving *ipse dixit*" are "insufficient to defeat a motion for summary judgment" (citing *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996))). Moreover, Kitani continued to use intermittent FMLA leave throughout this period. *See Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 136 (2d Cir. 2018) (summary order) (plaintiff did not establish genuine dispute of material fact as to whether defendants acted willfully where, among other things, plaintiff "requested and was granted time off under the FMLA eight times during her tenure"). Thus, there is no basis in the record for a factfinder to conclude that Defendants engaged in FMLA violations, let alone willfully or recklessly, by providing her with ADA reasonable accommodation forms.

There is likewise no evidence in the record that would create a genuine dispute of material fact as to whether the other cited conduct from 2016 until January 2017 could be considered willful interference with her FMLA leave. Kitani claims that Defendants did not submit Kitani's timesheets in 2016 and therefore she was subsequently denied continuous FMLA leave between July and September 2016. Pl. SUF ¶ 40. Instead, the record reflects that Kitani, not Defendants, failed to submit her timesheets, resulting in the subsequent denial of her FMLA leave. *See* Oath I Tr. 943:2-944:4 (Kitani: timekeeping told her that she "you didn't submit all the timesheets"). Kitani does not cite to any evidence of Defendants' purported failure to submit timesheets, and instead simply asserts that Defendants' denial of her continuous leave means they must have failed to maintain accurate time records. *See* Pl.

RSUF ¶ 40.  This unsubstantiated speculation is insufficient to defeat summary judgment.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001))).  Moreover, while Kitani's continuous FMLA leave was initially denied on the ground that she had not worked 1,250 hours prior to her application, as required by the FMLA, *see* Oath I Tr. 940:23-948:24, this does not amount to a willful violation of the FMLA as a matter of law. *See Lewis v. N.Y.C. Police Dep't*, 908 F. Supp. 2d 313, 325 (E.D.N.Y. 2012) (plaintiff's claim of FMLA interference was not subject to three-year statute of limitations where defendants' cited reason for denying request for leave was that they did not believe she had worked the requisite hours to be eligible for FMLA leave), *aff'd*, 537 F. App'x 11 (2d Cir. 2013); *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 53-54 (2d Cir. 2017) (summary order) (plaintiff did not allege a willful violation of the FMLA where there were reasonable justifications for why defendant denied the requested FMLA leave).

There is also no evidence in the record supporting Kitani's clam that Defendants suspended her in January 2017 so that she would not qualify for FMLA leave in 2018.  The record contains extensive evidence as to the basis for Plaintiff's suspension in January 2017, which occurred only after Defendants issued disciplinary charges stemming from multiple instances of insubordination, almost all of which were upheld after an impartial hearing before an ALJ.  *See Hill v. N.Y.C. Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) ("[The] FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004))); Oath I R&R at 34-35.  Kitani's unsupported conjecture that she was "deprived of hours to meet the

FMLA eligibility requirements for 2018" because her "colleagues expressed their concerns [and] raised the possibility that the Plaintiff's suspension was intentionally designed to impact her ability to qualify for FMLA leave in 2018," Opp. at 11, is insufficient to support a violation of the FMLA, let alone a willful one. *See Cifarelli*, 93 F.3d at 51 (to survive summary judgment, "mere conclusory allegations, speculation or conjecture" will not suffice).

Finally, Kitani's claim that Defendants Cassella and Syldor excluded her from work assignments, training opportunities, and overtime work from February to October 2016 is unsupported by the record. The record reflects that Kitani declined repeated requests to work overtime. *See, e.g.*, Kitani Decl. at 23-26 (e-mails from Kitani to Syldor declining overtime shift). With respect to training opportunities, Kitani relies on an e-mail from DiRuggiero to Plaintiff and Syldor, which simply observed that Kitani had not performed inspections in about a year, and was not in meetings or discussion sessions. *See* Pl. SUF ¶ 39; Kitani Decl. at 37. This evidence does not support an inference of interference, let alone a willful violation, given that, far from endeavoring to exclude Kitani, the e-mail suggested that she be trained in the new forms and procedures and provided with the new bulletin. Kitani Decl. at 37.

Kitani was able to use intermittent FMLA leave on numerous occasions in 2016 with no difficulty. *See Mejia*, 751 F. App'x at 136 (alleged FMLA violations were not subject to three-year statute of limitations where plaintiff was able to take FMLA leave repeatedly). The record further reflects that the Defendants frequently took steps to try to comply with the FMLA in their interactions with Kitani, including speaking with Dr. Lim, Oath I Tr. 70:7-13, and encouraged Kitani to consider applying for FMLA leave, Oath I Tr. 134:9-18. There is thus no record evidence creating a genuine issue of fact as to whether Defendants' actions were willful violations of the FMLA. *See Porter*, 392 F.3d at 531-32 ("[I]f an employer acts

reasonably in determining its legal obligation, its action cannot be deemed willful.  If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then it should not be considered willful." (brackets and ellipses omitted) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988))).

With respect to Kitani's retaliation claims, there is also no evidence in the record that supports an inference that the Defendants engaged in willful retaliation against Kitani based on her exercise of FMLA rights.  Defendants have established legitimate nonretaliatory reasons for their actions and Plaintiff has not shown pretext, let alone shown willful or reckless retaliation.  Taking each assertion by Kitani in turn, there is no genuine issue of fact that that Defendants engaged in willful retaliation by: (1) assigning her to overnight shifts in October 2016 given that she had complained about not being assigned such shifts earlier, *see* Oath I Tr. 66:15-68:25; (2) listing Kitani as AWOL when she repeatedly refused to work the mandatory overnight shifts, *see* Kitani Decl. at 23-26; (3) directing Kitani to report for an ability-to-perform assessment when she reported that she could not come into work because she passed out at home, Oath I Tr. 398:13-400:10, 401:20-402:11; (4) failing to provide her with a G-46 form immediately when she was in fact provided with the form later in the day, *see* Oath I R&R at 32-33; Oath I Tr. 1348:18-1350:8; and (5) initiating disciplinary charges against her on January 9, 2017, when those charges were largely upheld by ALJ Gloade following an Oath Hearing, *see* Oath I Tr. 107:2-10; Oath I R&R at 34-35.  Opp. at 14-16.[4] As Kitani has made no showing of willfulness beyond labeling the aforementioned behavior

---

[4] Kitani also briefly mentions that Defendants failed to remove an AWOL classification related to the 2016 bereavement-leave investigation from her records and failed to pay her bereavement benefits.  Opp. at 17-18.  Kitani cites to no admissible evidence in her opposition to support this assertion.  *See id.*; Pl. SUF ¶¶ 36-46.  To survive summary judgment, "mere conclusory allegations, speculation or conjecture" will not suffice.  *Cifarelli*, 93 F.3d at 51.

as retaliatory, such as "provid[ing] evidence [d]efendants had actual knowledge they were

violating the FMLA" or evidence that they "disregarded their obligations under the FMLA,"

*Reyes*, 2012 WL 3764061, at *4, the Court concludes that Kitani has failed to show that a jury

could find that Defendants' conduct constituted a willful violation. *See Hamlett v. Srivastava*,

496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) ("That a party appears pro se, though entitled to

some latitude not accorded to litigants represented by counsel, does not relieve [her] of the

obligation to respond to a motion for summary judgment with sufficient admissible evidence."

(citing *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003))).

For these reasons, the Court concludes that a two-year statute of limitations applies to

Kitani's FMLA interference and retaliation claims and that all of the conduct identified in her

brief as interference or retaliation is time barred.

### C.  Other Alleged Retaliation

In an abundance of caution, and in light of Kitani's *pro se* status, the Court also

addresses instances of retaliation after February 1, 2017 that Kitani identified in her Rule 56.1

Statement of Undisputed Facts, but did not discuss at all in her opposition brief.  Kitani argues

that she was retaliated against when Defendants (1) suspended her without pay for forty days

following ALJ Gloade's decision; (2) issued counseling memos on March 12 and May 10,

2018, (3) assigned her to the chronic sick list in June 2018; and (4) initiated disciplinary

proceedings against her on February 26, 2019.  Pl. SUF ¶¶ 44-46; *see* Kitani Decl. at 41; TAC

¶ 86.  Even if timely, these claims fail on the merits.

Regardless of whether Plaintiff has set forth a *prima facie* case of retaliation,

Defendants have articulated "legitimate, clear, specific and non-discriminatory reason[s]" for

their actions.  *Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 287

(S.D.N.Y. 2013) (citation omitted).  First, Plaintiff's suspension without pay in February 2018

was instituted after a full hearing before ALJ Gloade. Defendants submitted ALJ Gloade's decision, which noted that the basis for the charges were Kitani's alleged submission of incomplete and/or inaccurate records, absences without authorization, failure to report for mandatory overtime, failure to submit required documentation, and insubordination. Oath I R&R at 1. ALJ Gloade found that Kitani had been repeatedly insubordinate, failed to report for mandatory overtime, and engaged in a pattern of defiance of her supervisors' directives. *Id.* at 34-36. After the hearing, and based on ALJ Gloade's recommendation of a forty-day suspension without pay, Defendants suspended Kitani. *See* Oath I R&R at 36; Kitani Dep. Tr. 41:25-42:5. A recommendation by an impartial ALJ is a legitimate, nondiscriminatory reason for Defendants to suspend Kitani without pay for forty days. *See Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 699 (S.D.N.Y. 2020) (defendants satisfied their burden of offering legitimate and nondiscriminatory reasons for termination where an ALJ found that plaintiff was "insubordinate," among other things, and recommended termination based on the charges in the OATH hearing).

Second, Defendants have shown a legitimate, nondiscriminatory reason for the counseling memorandum given to Kitani on March 12, 2018. Syldor gave Kitani the memorandum the day she returned from her suspension. Oath II Tr. 120:2-121:8. The memorandum included a reminder of her work hours and work location, and the requirement that she "perform any and all work assignments (office work and field work), as required by any Civil Engineer working in MOW Engineering, unless MAC Assessment deems otherwise," and that "[a]ll rules for sick time, vacation or other required absence shall be adhered to." Kitani Decl. at 41. At the Oath Hearing before ALJ Spooner, Syldor testified that the memo was provided to Kitani "because she hadn't been to work in approximately a year" and it was meant to "go over the basic guidelines and remind her of what her work

hours would be, what her . . . regular days off[] would be, . . . where she would be assigned as far as seating, and also what the rules are for sick time, having vacation, or if [she] had to . . . deviat[e] from your normal work hours."  Oath II Tr. 120:18-121:2.  These are legitimate and nondiscriminatory reasons for Defendants to provide Kitani with the March 2018 memorandum.

As for the counseling memorandum Kitani received on May 10, 2018, Syldor explained that at that point, Kitani had "more than five unsubstantiated sick . . . leave instances," and the "purpose of [the] memo was . . . to inform her that if she had one more . . . unsubstantiated sick [leave instance], she would be placed on the chronic sick leave [list]."  Oath II Tr. 121:9-18.  The Court finds that Defendants have offered a legitimate, nondiscriminatory reason for the May 10, 2018 counseling memorandum.  *See, e.g.*, *Shepheard v. N.Y.C. Corr. Dep't*, 360 F. App'x 249, 251 (2d Cir. 2010) (summary order) (plaintiff's violation of department rules and regulations related to sick leave, as evidenced by disciplinary charges upheld at an administrative hearing, offered legitimate, nondiscriminatory reason for adverse employment action); *cf. Edwards v. Elmhurst Hosp. Ctr.*, No. 08-cv-03686 (RRM) (LB), No. 09-cv-01679 (RRM) (LB), 2010 WL 11623370, at *9 (E.D.N.Y. Sept. 21, 2010) (failure to follow sick leave protocol, among other reasons, constituted a legitimate, nondiscriminatory reason for taking adverse employment action).

Next, Defendants' proffered reason for the June 12, 2018 memorandum was to inform Kitani that she had been placed on the Chronic Sick List due to continued instances of unsubstantiated sick leave.  Oath II Tr. 121:23-122:5.  The May 2018 memorandum had informed Kitani that her next instance of undocumented sick leave would result in placement on the Chronic Sick List.  *See* Kitani Decl. at 42.  Kitani then had undocumented absences on May 14, May 21, May 31, and June 11, 2018.  Oath II Tr. 145:13-147:12.  She was placed on

26

the Chronic Sick List on June 12, 2018.  Kitani Decl. at 43.  As such, the Court concludes that NYC Transit has come forward with legitimate, nondiscriminatory reasons for placing Kitani on the Chronic Sick List, namely, her "failure to follow established procedures governing absence from work or leave periods," which is a "familiar" legitimate, nondiscriminatory basis for an adverse employment action, *see Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 465 (S.D.N.Y. 2023).

Finally, Defendants have offered a legitimate, nondiscriminatory reason for initiating disciplinary charges against Kitani on February 26, 2019.  Defendants submitted ALJ Spooner's R&R, wherein he upheld all of the charges for Kitani's insubordination relating to her refusal to acknowledge the three memoranda, her failure to submit sick leave documentation as required by NYC Transit rules and her union contract, her failure to provide original medical notes after being directed to do so, and her refusal to cooperate with an investigation into the authenticity of medical certifications.  Oath II R&R at 5-8.  This satisfies Defendants' burden to offer evidence of a legitimate, nondiscriminatory reason for the commencement of disciplinary charges.  *See Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*, 734 F. App'x 773, 775 (2d Cir. 2018) (summary order) (plaintiff's noncompliance with "[d]efendants' established rules and procedures" and failure to timely "submit leave reports allocating personal or sick leave for her unauthorized absences" met burden to show legitimate, nondiscriminatory reason for suspension); *cf. Skates v. Incorporated Village of Freeport*, 265 F. Supp. 3d 222, 241-42 (E.D.N.Y. 2017) (defendant provided satisfactory nondiscriminatory reason for adverse employment action based on plaintiff's failure to comply with leave policy where it submitted charges and specifications outlining the basis for plaintiff's termination).

Thus, the Court finds that Defendants have met their burden to provide legitimate, nondiscriminatory reasons for each of the above adverse employment actions. At this stage, the burden shifts back to Kitani to provide "sufficient evidence for a factfinder to conclude that defendants' purported rationale was actually a pretext for retaliation." *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 158 (S.D.N.Y. 2011). A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziado*, 817 F.3d at 430.

Kitani has failed to adduce evidence that would permit a reasonable jury to find that Defendants' proffered reasons were merely pretextual. Indeed, Kitani's opposition does not address pretext, nor has she identified contradictions, implausibilities, or inconsistencies in Defendants' explanations. The only arguments that the Court can extrapolate from Kitani's opposition brief are that retaliation can be inferred because Costa allegedly threw the written disciplinary charges across the table at her in a hostile manner, and because of the timing of the adverse actions taken against her. *See* Opp. at 16. Neither supports a finding of pretext.

As to the first contention, Kitani claims that when Costa issued disciplinary charges against her, he threw the papers across the table at her, demonstrating retaliatory intent. Opp. at 16. Assuming this occurred, a review of the record indicates that this allegation relates not to the February 2019 disciplinary charges, but to the January 9, 2017 charges, which are time barred. *See* Oath I Tr. 1410:14-1414:24. The Court does not find that this 2017 incident — which allegedly took place more than a year before the counseling memoranda and more than two years before the 2019 disciplinary action — indicates that Defendants' nondiscriminatory rationales were a pretext for impermissible retaliatory motives in 2019.

*See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 207 (S.D.N.Y. 2009) (incident more than a year before adverse employment action did not support a claim of FMLA retaliation because it was too remote in time).

As for any timing arguments regarding other adverse actions, the Second Circuit "ha[s] been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext." *Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820-21 (2d Cir. 2014) (summary order) (first citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); and then citing *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (summary order)); *Brown v. Northrop Grumman Corp.*, No. 12-cv-01488 (JS), 2014 WL 4175795, at *16 (E.D.N.Y. 2014) (explaining that temporal proximity alone "does not create a triable issue of fact as to pretext"). Here too, any temporal proximity between Kitani's exercise of rights under the FMLA and the actions taken by Defendants does not, without more, permit Kitani's FMLA retaliation claim to survive summary judgment.

Because Kitani has failed to present evidence contradicting Defendants' proffered legitimate, nondiscriminatory reasons for the actions taken, she has failed to satisfy her burden at step three of the *McDonnell Douglas* test. Therefore, Defendants' motion for summary judgment is granted with respect to Kitani's otherwise timely claims for FMLA retaliation.

## II.    NYLL Claim (Count II)

Defendants also move for summary judgment on Count II. In Count II, Kitani alleges that in or around October or November 2016, Defendants deducted monies from her wages

without her knowledge or permission, in violation of Section 193(1)(c)[5] of the NYLL.  TAC

¶¶ 119-126.  Defendants argue that Kitani's NYLL claim should be dismissed because NYC

Transit has been held to be a political subdivision exempt from the NYLL.  Br. at 18.  Kitani

does not respond to Defendants' argument and simply repeats the elements of her NYLL

claim.  *See* Opp. at 19-20.

Kitani's claim arises under New York State's wage theft statute, Article 6 of the

NYLL.  *See* TAC ¶¶ 119-126; N.Y. Lab. Law § 190 *et seq.*; N.Y. Lab. Law § 193.  Article 6

excludes "governmental agenc[ies]" from its definition of covered employers.  N.Y. Lab. Law

§ 190(3).  In support of their argument that NYC Transit is exempt from Kitani's NYLL

claim, Defendants cite to *Vlad-Berindan v. New York City Metropolitan Transit Authority*,

No. 14-cv-10304 (VEC) (FM), 2016 WL 1317700 (S.D.N.Y. Apr. 1, 2016), *aff'd*, 779 F.

App'x 774 (2d Cir. 2019) (summary order).  That decision, however, held that NYC Transit

was not a "political subdivision" based on a different Article of the NYLL — Article 19, New

York State's minimum wage act.  *Id.* at *4; *see* N.Y. Lab Law §§ 650 *et seq.*  NYLL Section

651's definition of "'employee' excludes 'any individual who is employed or permitted to

work: . . . by a federal, state or municipal government or political subdivision thereof.'"  *Vlad-*

*Berindan*, 2016 WL 317700, at *4 (quoting N.Y. Lab. Law § 651(5)(n)).  It does not resolve

whether NYC Transit is a governmental agency under Section 190(3).

Despite this, the Court is persuaded that NYC Transit is an exempt governmental

agency under Section 190(3).  Two other courts to have considered the issue have found that

NYC Transit (a subsidiary of the Metropolitan Transit Authority) qualifies as a government

---

[5] The TAC refers to a violation of NYLL Section 195-5.1.  No such section of the Labor Law exists, and Kitani is likely referring to title 12, section 195-5.1 of the New York Codes, Rules, and Regulations, N.Y. Comp. Codes R. & Regs. tit. 12, § 195-5.1, which are regulations that are issued pursuant to Section 193 of the NYLL regarding deduction of wages.

agency. *See D'Antonio v. Metro. Transp. Auth.*, No. 06-cv-04283 (KMW), 2008 WL 582354, at *5 (S.D.N.Y. Mar. 4, 2008); *Greene v. Metro. Transp. Auth.*, No. 22-cv-03300 (JMA) (ST), 2024 WL 4235480 (E.D.N.Y. Sept. 19, 2024).  In *Greene*, the court thoroughly analyzed the statutory text, statutory history, and legislative history of the NYLL and concluded that the Metropolitan Transit Authority and its subsidiaries, including NYC Transit, were exempt government agencies under Section 190(3) "as a matter of plain text."  2024 WL 4235480, at *4; *see id.* at *4-6.  The statutory and legislative history supported the court's conclusion.  *See id.* at *5-6.  In *D'Antonio*, the court relied on decisions from other contexts to conclude that the MTA and its subsidiaries were exempt government agencies.  *See* 2008 WL 582354, at *5 (citing *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328, 338 (D. Conn. 2007) (sovereign immunity); *Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 96 (E.D.N.Y. 2004) (due process claim)).  The Court is persuaded by the straightforward statutory readings and reasoning presented in these cases, and agrees that NYC Transit is an exempt government agency under Section 190(3).  As a result, Kitani cannot sustain her NYLL wage deduction claim against Defendants, and the Court will enter summary judgment for Defendants on Count II.  *See D'Antonio*, 2008 WL 582354, at *5 (dismissing NYLL wage-deduction claim because NY Transit did not qualify as an employer under Section 190(3)); *Greene*, 2024 WL 4235480, at *7 (dismissing NYLL frequency-of-pay claim because the MTA and its subsidiaries did not qualify as an employer under Section 190(3)).

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment.  The Clerk of Court is respectfully directed to enter judgment in favor of

Defendants, to mail a copy of this Opinion and Order to Kitani at her address of record, and to close this case.

Dated:  February 11, 2025
        New York, New York

                                SO ORDERED.


                                _Jennifer Rochon_____
                                JENNIFER L. ROCHON
                                United States District Judge